## STATE OF IOWA, Appellee, v. A. J. BOYD, Appellant.

**CRIMINAL LAW:. Evidence—Other Offenses—Receiving Stolen Property.** On the trial of an indictment for receiving stolen property, it may be shown that the defendant received other stolen property subsequent to the receipt of the stolen property in question.

**CRIMINAL LAW: Evidence—Accomplices—Receiving Stolen Property.** One who steals property is not the accomplice of one who *receives* the stolen property.

**CRIMINAL LAW: Trial—Verdict—Sufficiency.** A verdict in a criminal cause need not enumerate the *elements* of the offense of which the jury finds the accused guilty.

**CRIMINAL LAW: Judgment—Term of Imprisonment.** It is immaterial, under the Indeterminate Sentence Act, that an accused who has been convicted of receiving stolen property is sentenced "for the full term of five years."

**RECEIVING STOLEN PROPERTY: Defenses—Guilt of Original Theft.** It is no defense to a charge of receiving stolen property that the accused might have been indicted as a principal in the original larceny.

**RECEIVING STOLEN PROPERTY: Elements of Offense—Larceny.** The statute relative to receiving stolen property covers goods obtained by a "breaking and entering."

**CRIMINAL LAW: Trial—Misconduct of Counsel—Failure to Object.** Objections to *some* of the alleged acts of misconduct on the part of the county attorney may give complainant the right to appellate review on *all* of said acts.

**CRIMINAL LAW: Trial—Misconduct of Counsel—Inflammatory Attack.** Reversible error may result from a highly inflammatory verbal attack, in argument by the county attorney, on the character, conduct, and standing of the attorney for an accused in a criminal cause, when such attack is without support or justification in the record.

*Appeal from Jefferson District Court.*—D. M. ANDERSON, Judge.

### DECEMBER 15, 1922.

DEFENDANT was indicted by the grand jury of Jefferson County, charging the crime of receiving stolen property. The

jury returned a verdict finding defendant guilty. Judgment was entered on the verdict, sentencing the defendant, under the statute, to five years' imprisonment, from which judgment, defendant appeals.—*Reversed and remanded.*

*Lloyd L. Duke,* for appellant.

*Ralph H. Munro,* County Attorney, and *Ben J. Gibson,* Attorney-general, for appellee.

ARTHUR, J.—I.   The State introduced testimony tending to show—which we think was sufficient to support the verdict—that, in December, 1920, defendant arranged with a young man by the name of Glenn Hoskinson, who had been a resident of Fairfield in Jefferson County, and who at that particular time was living in Muscatine, Iowa, where he had been employed as a button cutter, to engage in the business of breaking into box cars containing shipments of merchandise, and to deliver articles taken from these cars to the defendant's store at Fairfield, Iowa; that it was agreed between Hoskinson and defendant that the defendant should pay one half of the wholesale price for any articles delivered to him that could be used by him in his (defendant's) store; that, shortly after the arrangements were made, Hoskinson went to Muscatine and formed a partnership with a young man by the name of Dick Worley, who had some previous experience in breaking into box cars; that Hoskinson and Worley proceeded to carry out the plans suggested by defendant in his talk with Hoskinson; that Hoskinson and Worley first broke into a car in the yards at Muscatine, and took therefrom several cartons of shoes and packages of tobacco; that they hid these articles on an island in the Mississippi River, and then went to Fairfield, where defendant was advised of the nature of the articles taken by them from the car; that defendant sent his driver, with his delivery truck, to Muscatine, where the goods so taken were packed up and hauled to and delivered at defendant's store in Fairfield; that defendant there and then paid Hoskinson and Worley for the goods then delivered, deducting $10 for the use of the truck in hauling the goods to defendant's store; that this transaction was about the 1st of March, 1921; that, shortly after that, Hoskinson and Worley broke open a car

belonging to the Burlington railroad, and took out some Velvet tobacco and delivered it to defendant at his store, for which defendant paid him $65 or $70.

Hoskinson testified that the next time he and Worley broke into a car was at Washington, Iowa, and that it was a merchandise car belonging to the Milwaukee railroad, from which they took five cases of shoes; that he notified defendant by telephone of their getting the shoes; that defendant sent his car over to Washington; that he and Worley loaded the shoes into the car and took them to defendant's store, where the shoes were delivered to defendant; and that defendant paid them about $80 for them, and took out $10 for the use of his car. The shoes obtained by breaking into the Milwaukee car at Washington, Iowa, are the shoes that defendant is charged in the indictment with having received.

There was further evidence tending to show that several cars were broken into by Hoskinson and Worley and goods taken out and sold and delivered to defendant at his place of business in Fairfield, Iowa. It appears without dispute that Hoskinson sold and delivered to defendant at his store goods that had been stolen from cars that had been broken into, including the merchandise described in the indictment.

It is the defendant's claim that the goods were purchased from Hoskinson without any knowledge on the part of the defendant that they were stolen; and it is also claimed by defendant that most of the goods purchased from Hoskinson were purchased by defendant's wife, who seems to have been in charge of the store a considerable part of the time, and that defendant had no knowledge of the larceny of the merchandise so purchased. The defendant's wife, as a witness for the defense, claimed that she believed Hoskinson to be a traveling salesman, representing wholesale and jobbing houses carrying the class of merchandise which had been sold by him to them.

Hoskinson was a witness for the State, and testified in detail as to the arrangements made between the defendant and himself, whereby he was to engage in breaking open cars containing shipments of merchandise and deliver to defendant's store the articles taken.

Appellant assigns as error refusal of the court to grant a new trial on several grounds, which we will consider.

II. Appellant assigns as error the permitting of introduction of evidence by the State to show that defendant received stolen property at times subsequent to the time charged in the indictment. Admission of such testimony was not error. We have frequently held that evidence of a similar transaction is admissible for the purpose of showing guilty knowledge on the part of the defendant that the goods which he received or concealed had been stolen. *State v. Scott*, 136 Iowa 152; *State v. Levich*, 128 Iowa 372.

1. CRIMINAL LAW: evidence: other offenses: receiving stolen property.

III. Appellant contends that Hoskinson was the accomplice of the defendant, and that for that reason his evidence required corroboration. We have held a number of times that, where the charge is receiving stolen property, the original thief is not an accomplice, and it is, therefore, unnecessary that his testimony should be corroborated, to support a conviction. *State v. Scott*, supra; *State v. Feinberg*, 145 Iowa 329. However, there was an abundance of corroboration of the testimony of Hoskinson. The finding in the store of the defendant of the goods in question which Hoskinson took from the car, and the acceptance of their delivery, as detailed by other witnesses, constituted ample corroboration, if such were necessary.

2. CRIMINAL LAW: evidence: accomplices: receiving stolen property.

IV. Counsel for appellant argues that the finding of the jury was not in accordance with the evidence. The verdict of the jury reads as follows:

"We, the jury, find the defendant, A. J. Boyd, guilty of the crime of receiving stolen goods, and find the value of the property so received at $344.10."

3. CRIMINAL LAW: trial: verdict: sufficiency.

The criticism made of this verdict is that it did not contain the word "knowingly," the claim of appellant being that the defendant had to receive the goods *knowing* that they were stolen, and that this was essential in the verdict. It was necessary for the State to prove that defendant received the goods *knowing* them to be stolen, but it was not necessary for the jury, in returning its verdict, to incorporate into the verdict all the

elements upon which their findings were predicated. All of the essential elements of the crime must be proven; and when a jury returns a verdict of guilty, that means that they have determined that all of the essential elements were presented and proven. There was no error in this respect.

V.  It is urged by appellant that the judgment entered is faulty, for the reason that defendant was sentenced to the penitentiary "for the full term of five years." The maximum term for the offense is five years. Our indeterminate

4. CRIMINAL LAW: judgment: term of imprisonment. sentence law takes care of that feature of the judgment, and any penalty imposed, where the offense comes under the indeterminate sentence law, as in the instant case, is superfluous and unnecessary. Defendant's stay in the penitentiary, if he goes there, will neither be prolonged nor shortened by reason of the statement made in the judgment of the trial court.

VI.  A point on which appellant relies for reversal is that, according to the evidence, the appellant is guilty, if guilty of any crime, either as principal or as an accessory before the fact in the burglary itself, instead of the crime

5. RECEIVING STOLEN PROP- ERTY: defenses: guilt of original theft. charged,—that of receiving stolen property. In the case at bar, according to the evidence for the State, defendant induced and procured Glenn Hoskinson to break and enter box cars containing merchandise; to procure such merchandise as could be sold in defendant's store; to break and enter cars that were in transit from one state to another. It was also agreed that appellant would have his truck sent to the scene of the robberies and have the goods taken therefrom, and that appellant would receive the goods and pay Hoskinson one half of the wholesale price of all such goods. Counsel for appellant insists that, if this evidence be true, then defendant aided and abetted Hoskinson, both before and after the fact, and was guilty as a principal in the burglary itself, under Code Section 5299. Counsel insists that defendant must have been indicted, if at all, under the facts, as a principal in the burglary itself. Code Section 5299 reads:

"The distinction between an accessory before the fact and a principal is abrogated, and all persons concerned in the commission of a public offense, whether they directly commit the

act constituting the offense, or aid and abet its commission, though not present, must hereafter be indicted, tried and punished as principals.''

It is true, as contended by counsel for defendant, that one who aids and abets is, under this statute, in the same category with one who actually, physically, and manually commits the offense. It is also true that, under the common law, a person who aided and abetted in the commission of a public offense was, under some circumstances, guilty as an accessory before the fact, and under others, as an accessory after the fact; and it was necessary that the accessory should be indicted and tried as such, and he could not be indicted and tried as a principal. Our statute above quoted, Section 5299, does not, and no statute could, change or abrogate the actual manner of participation of one committing a crime. This statute does not attempt to define any crime. The statute merely abrogates the common-law form of procedure, and provides a different procedure, by directing that an accessory before the fact (that is, one who aids and abets in the commission of a crime, though not present) shall be indicted, tried, and punished as a principal. The statute does not define an offense, but only provides the manner in which persons who are actually present and manually and physically commit an offense, and persons who may not be present and physically participate, but who in some manner participate in and materially aid in its commission, shall be indicted and tried. Under the statute, as before its enactment, there is the ''principal,'' in the person of the one who actually, manually, and physically commits the crime, and there may also be a person who assists the principal, and aids and abets in some manner in the commission of the offense; and the identity of this person, formerly styled an ''accessory,'' is not changed by the statute, but the statute provides that he shall be indicted and tried as a principal.

Under the common law, a person who aided and abetted in the commission of a public offense was guilty as an accessory. The common law recognized an accessory before the fact and an accessory after the fact, and, under the common law, an accessory was indicted and tried as an accessory, and could not be indicted and tried as a principal. This was true of all crimes,—

not only of larceny, but of murder, arson, and crimes generally. The legislature, in adopting Code Section 5299, intended to and did abrogate the distinction that had existed at common law between an accessory before the fact and a principal, and provided that all persons concerned in the commission of a public offense, whether they directly commit the act or aid and abet in its commission, must be indicted, tried, and punished as principals, and not as accessories. This changed the method of procedure in regard to accessories in all crimes. Then the legislature, as an entirely separate and distinct statute, provided for the establishment of a new and distinct statutory crime,—one not known or recognized at common law, to wit, the offense of receiving stolen property. This statutory crime is the crime for which appellant was indicted in this case. Whether or not a party who may be indicted for this distinct offense of receiving stolen property might also be indicted as a principal for some other offense, as burglary or larceny, to which he might have been an accessory under the common law, is a question which we do not have before us in this case, and upon which we are not required to express an opinion. What we do hold at this point is that defendant was specifically charged by indictment with the distinct and separate statutory offense of receiving stolen property. It is no defense to that action for him to claim that he might have been indicted as principal in some other offense, either burglary or larceny. He is now charged with this distinctive, statutory crime of receiving stolen property. Whether or not a conviction of such an offense would be a bar to a conviction of the offense of either burglary or larceny is not involved in this appeal, and upon it we express no opinion. We are limiting our decision to the single proposition that the legislature has created a distinct and separate statutory offense, known as the crime of receiving stolen property. It is for this offense, and it alone, that the defendant has been indicted in this case. The sole question to be determined is whether or not he is guilty of such an offense. If he is, it is no defense to this action to claim that he might be charged as principal in some other offense, as burglary or larceny.

VII.  Counsel for appellant also urges that Code Section 4845 makes it an offense to receive goods that are obtained by

means of larceny, robbery, or burglary, and does not cover goods
obtained by means of breaking and entering.

6. RECEIVING STOLEN PROPERTY: elements of offense.

The position is not tenable. Where goods are taken as a result of breaking and entering, there must necessarily be a larceny.

VIII. Appellant complains that the county attorney was guilty of misconduct in his arguments to the jury.

Counsel for the State contends that some of the statements

7. CRIMINAL LAW: misconduct of counsel: failure to object.

which appellant claims constitute misconduct were not challenged at the time they were uttered, and no objections made, so that there could be a ruling by the court and exceptions preserved in the record; and that no consideration should be given complaints in such instances on this appeal. Ordinarily, the position taken by attorneys for the State would be correct, but we think that in the instant case they are not well taken. The record discloses that counsel for defendant frequently challenged statements by the county attorney in argument of the case to the jury, and objected to the language used and statements made, and that the objections made were of such a character as to indicate and mean objection to other parts of the argument where he did not interrupt the county attorney. The objections made were sufficient to apprise the county attorney and the court of appellant's objections to all of the statements complained of. We think that the objections and exceptions made by appellant, though not made to each and all of the statements now complained of, were sufficient to warrant review of all the statements complained of. *State v. Peirce,* 178 Iowa 417. In opening his argument to the jury, counsel for defendant said:

"I am sorry that I have not been assisted by a member of the Jefferson County Bar."

In his closing argument, the county attorney, alluding to this statement, said that:

"Defendant's attorney comes in here and tells you gentlemen that there isn't an attorney in Jefferson County who would associate with him in the trial of this case. Think of it, gentlemen,—apologizes to you in the beginning that not a single attorney of the Jefferson County bar would even sit down to

the table with him, and his client would not employ anyone connected with the Jefferson County bar.''

Counsel for defendant interrupted, saying:

''I wish to take exception to that statement, as misconduct on the part of the county attorney and prejudicial error: that there is not in evidence here, or no statement of mine, that any lawyer of the Jefferson County bar refused in any way to sit with me in this cause.''

Continuing, the county attorney said:

''I wish to say in reply to this statement that counsel for the defendant made the statement in the very beginning of his argument, and I made a notation that the very first thing he said to this jury was that he 'was sorry he had not been assisted by any member of the Jefferson County bar.' If you please, those are his words. I wrote them down just as he said them. Why wasn't he assisted by any member of the Jefferson County bar, if you please?''

There seems to be no question as to the exact statements made by appellant's counsel in his opening argument, on which the county attorney predicated his statements made in his closing argument to the jury. Proceeding further, the county attorney said:

''There is only one of two reasons: It is either because he tries to make you believe that the state agents, Mr. Hanson, the Milwaukee representative, Mr. Holland, or some of the Rock Island representatives, and those who are trying to break up this thievery and this stealing, are all corrupt, and that the Jefferson County bar is all corrupt, so corrupt they wouldn't be trusted to try this godly sphinx who sat on this witness stand and said 'no,' without a twinge or a move; who with his wife tried to stare me off my chair during the progress of the trial; and whose attorney made absolutely no affirmative argument.''

Further alluding to counsel for defendant, the county attorney said:

''I do not know whether he sat in that poker game in Ottumwa or not, when Boyd sat up all night,—maybe that is how he got in the case; but it is something peculiar that he did not offer to explain.''

The county attorney made the following personal remark concerning appellant's counsel:

"I do not believe one of these fellows that actually confided their innermost secrets to Duke,—I do not believe they would steal Duke's car. I think he knows it. He is well acquainted with all of that class and variety, and they would not steal from him. He don't need to lock his garage, if you please."

There is nothing in the record to warrant the statement to the jury that Mr. Duke was in league with a gang of thieves to such an extent that no thief would steal his car. Such a statement, made by the county attorney, made concerning a lawyer not residing in Jefferson County, was highly improper, and prejudicial to the rights of defendant.

8. CRIMINAL LAW: misconduct of counsel: inflammatory attack.

Again, the county attorney said to the jury:

"I say, when a man like Duke, a criminal lawyer of the reputation that he bears, and the vast experience he has had, the confidant of John Junkin, if you please, to whom nobody else John Junkin would make his confession in the first instance until he had seen his friend Duke, he said that not only Judge Dewey, Judge Smith, or Judge Hale, and the four judges of this court, but the officers of the Federal court, the agents of the attorney-general, are all corrupt. It is an awful situation in Jefferson County. It is an awful condition they have got here in Jefferson County. I say, gentlemen, it is an awful condition when not only the courts are all corrupt, but the members of the bar are all corrupt, that not even one of them could be secured to sit at the table with the defense during the trial of this case."

The only thing in the record on which to predicate the above statement was the statement made by Attorney Duke, referred to by the county attorney, when objection was made, and when the county attorney said:

"I made this memorandum honestly, and the first thing Duke said was he 'was sorry he had not been assisted by a member of the Jefferson County bar;' and I have a right to infer that there is reason why he has not been associated with any member of the Jefferson County bar, and that is the inference I draw."

We think there is no justification for such inference. The statement was highly improper, and we think must have been prejudicial to defendant.

Again, referring to defendant's counsel personally, the county attorney said:

"I say Lloyd Duke knows in his own heart that Andy Boyd is not only guilty of this, but any number of similar offenses; and I say there are peculiar circumstances, to use his own words, evidenced in all this trial. There are peculiar circumstances that connect him with A. J. Boyd's defense that have not been explained."

Again, the county attorney said:

"He [attorney for defendant] says there is not sufficient evidence—he says there is not sufficient evidence to convict this man. Now, gentlemen of the jury, when the evidence was all in in this case, he had the opportunity and he took that opportunity to argue that question to the court."

After objection to the statement had been sustained by the court, the county attorney continued:

"I simply say that, if there was not sufficient evidence for this case to go to the jury, it would not go to the jury. That's all there is to that. The court will tell what the law is of this case."

Again, the county attorney said:

"He [A. J. Boyd] testified in this court in the John Farmer case he was convicted of a felony. I have no way of proving it. I have no reason to disbelieve he was telling the truth. He was not on trial then. John Farmer was being tried. John Farmer, I guess the evidence showed, was then the husband of one of the phalanx of the defendant here in this alibi who sits here in the front chair near the jury as she can get. I do not know what the object is, unless she is interested slightly in the result of this suit, who with Mrs. Boyd has been trying to stare me off my chair; but like water off a duck's back, it does not bother me at all."

It does not appear in the record that defendant ever testified that he had been convicted of a felony. When asked whether or not he had so testified in the Farmer case, he answered:

"I told the court, just as I told them here now, that I had

been convicted of this crime [referring to the time when he was sent to the reform school] when I was a boy,—I never told them that I had been convicted of a felony while I was away, or somewhere in the south."

The only claimed provocation for the savage attack made by the county attorney on appellant's counsel was the remark made by appellant's counsel in opening his argument to the jury, that he "was sorry he had not been assisted by a member of the Jefferson County bar." Counsel for appellant, Mr. Duke, was a practicing attorney in the state of Iowa, a member of the Ottumwa bar. No statute required appellant to employ an attorney of the Jefferson County bar to assist Mr. Duke in the trial of his case. That Mr. Duke tried the case without assistance was a matter of no concern or interest to anyone but appellant, or perhaps Mr. Duke. The statement made by Mr. Duke on which the county attorney predicates his attack, without more, and with nothing further appearing in the record, certainly does not warrant the interpretation placed upon it by the county attorney, and we are not convinced that the county attorney really construed it to mean what he said it meant. It seems to us that the county attorney used the remark as an unwarranted excuse for the personal attack which he made upon Mr. Duke. At first blush, we are inclined to think that the vicious personal attack would carry with it its own antidote, and be harmless, so far as creating prejudice against defendant is concerned. But, upon reflection, we fear that the virulent attack by the county attorney, made before a jury of his own people, against a nonresident attorney, may have prejudiced the jury against appellant. Other statements of counsel, above quoted, were gratuitous, and not based upon the evidence. We are inclined to think that the statements of the county attorney which we have quoted must have effected passion and prejudice against the defendant, outside of and independent of the evidence in the case. We are aware of the wide latitude often indulged in argument by attorneys for defendants, and are inclined to allow a prosecuting attorney considerable liberty in argument, if the argument can, by any fair reasoning, be said to have been based upon testimony adduced or reasonable inference to be drawn from facts and circumstances presented. But

in the instant case, we can find no foundation or warrant in the record for the statements of the county attorney complained of.

For the reason above pointed out, we reach the conclusion that appellant's motion for a new trial should have been sustained. The judgment is, accordingly, reversed and remanded.— *Reversed and remanded.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.